**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

CHARLESTON MARINE CONTAINERS  )
INC.,                          )
                               )        No. 2:14-cv-00377-DCN
            Plaintiff,         )
                               )
    vs.                        )
                               )
SHERWIN-WILLIAMS COMPANY, THE, )        **ORDER**
                               )
            Defendant,         )
_____ )

      This matter is before the court on defendant The Sherwin-Williams Company's ("SW") motion for summary judgment. For the reasons set forth below, the court: (i) grants SW's motion with respect to plaintiff's claim for breach of contract; (ii) grants SW's motion with respect to plaintiff's claim for breach of contract accompanied by a fraudulent act; (iii) grants SW's motion with respect to plaintiff's claim for breach of express warranty; and (iv) denies SW's motion with respect to plaintiff's claim for negligent misrepresentation.

## I.  BACKGROUND[1]

      Plaintiff Charleston Marine Containers, Inc. ("plaintiff") manufactures shipping containers for use by the United States military according to precise specifications provided by the United States Government. Compl. ¶ 5. From 2005 until 2012, plaintiff supplied shipping containers manufactured using a chemical agent resistant coating ("CARC") system to various government customers. Id. ¶¶ 9–10. During the relevant time period, SW provided at least three of the four coatings used in the CARC system: (i) the Fast Clad Zinc primer; (ii) the CZO "touchup"

---

[1]      The following facts are presented in the light most favorable to plaintiff.

paint ("CZO Primer"); and (iii) an intermediate primer known as MP 846.[2]  Compl. ¶ 12; Def.'s Mot. 5.  The first layer of the CARC system, the Fast Clad Zinc primer, was applied to bare steel panels by plaintiff's Chinese supplier before the panels were shipped to plaintiff in Charleston, South Carolina.  Def.'s Mot. Ex. C, Baker Dep. I 50:24–51:23.  Plaintiff would then assemble the component panels into a container, a process which included welding at the container's joints.  Id. at 51:24–53:25.  After the welding was complete, the container was hand sanded and the CZO Primer was applied to the welded joint areas while the original Fast Clad Zinc remained on the rest of the container.  Id. at 55:1–4.  Next, the MP 846 intermediate primer was applied to the entire container.  Id. at 55:5–8.  Finally, a fourth paint was applied over the MP 846.  Id. at 55:9–11.

The CZO Primer, unlike the other coatings, was specifically designed for plaintiff's use.  Def.'s Mot. 5 n.6.  At some point prior to 2009,[3] plaintiff asked SW to create a coating that would match certain performance characteristics of another coating product plaintiff used at the time.  Pl.'s Resp. Ex. G, Lambrosa Dep. 15:25–19:8.  SW developed the CZO Primer, knowing plaintiff needed it to have certain performance characteristics.  Id. at 18:4–8, 18:23–19:8.  SW prepared and distributed a product information sheet for the CZO Primer, which was given to customers and explained the physical properties of the product.  Id. at 39:16–40:22.  Though the product information sheet indicates that the CZO Primer has certain dry times at 40 degrees Fahrenheit, SW never tested the CZO Primer at that temperature.  Id. 40:23–41:8; Def.'s Mot. Ex. R.

---

[2]    The fourth and final coating is immaterial to the dispute.
[3]    The exact timing is unclear, but not dispositive of any issue.

In 2009, the parties entered into an agreement (the "Supply Agreement") that established SW as plaintiff's "preferred supplier" of paint and coating products, and provided plaintiff with certain rebates for purchases of qualifying products. Def.'s Mot. Ex. Y. Though the term of the Supply Agreement was for one year, plaintiff does not dispute SW's assertion that the Supply Agreement remained in effect as long as plaintiff cashed the rebate checks. Def.'s Mot. 13. The Supply Agreement was extended in this manner through 2012. Id.

Plaintiff maintained its supply of paint and coating products through periodic purchase orders to SW. Pl.'s Resp. Ex. I. The purchase orders included a statement that "[plaintiff's] standard terms and conditions for US purchase orders" were modified to include certain Federal Acquisition Regulation clauses. Id. However, there is no evidence that the purchase orders actually contained the referenced terms and conditions. See id.; Def.'s Mot Ex. K, Baker Dep. II 32:11–33:17 (stating that under plaintiff's ordinary practice the purchase orders "would be accompanied by the [] standard terms and conditions sheets"). Plaintiff cannot confirm that the standard terms and conditions were ever actually presented to, or agreed to, by SW. Baker Dep. II 32:11–33:22; Baker Dep. I 187:11–189:5.

Beginning in January 2012, plaintiff's customers began reporting delamination problems between the zinc primer layer—the initial coating layer comprised of the Fast Clad Zinc and CZO Primer—and the MP 846 layer—i.e. the coating layers were separating from one another. Pl.'s Resp. Ex. B, Email Support Requests CMCI 0211–13. Plaintiff quickly reported the issue to SW, who contended that the delamination issues were caused by improper preparation or application of

3

the coatings.  Pl.'s Resp. Ex. C, SW Site Reports CMCI 0230–232, 234.  Plaintiff

contends that the delamination issues were actually caused by an incompatibility

between the CZO Primer and the MP 846 that occurred when the products were

applied at 52 to 57 degrees Fahrenheit, despite language in SW's product information

sheet indicating that the CZO Primer could be applied at temperatures as low as 40

degrees Fahrenheit.  Def.'s Reply Ex. 1, Weldon Op. CMCI 0568; Def.'s Mot. Ex. R.

On February 11, 2014, plaintiff filed its original complaint in this action.  On

As a result of the delamination problems and related delays, plaintiff allegedly

lost a major contract, incurred substantial costs, and lost customer confidence.  Pl.'s

Resp. 3, Ex. A, Baker Dec. ¶ 9.

On February 11, 2014, plaintiff filed its original complaint in this action.  On

March 19, 2015, plaintiff filed an amended complaint, and on April 16, 2015, SW

filed its answer to the amended complaint.  On July 27, 2015, SW filed the instant

motion for summary judgment.  Plaintiff filed a response on August 20, 2015 and SW

filed a reply on September 1, 2015.  The court heard arguments on the instant motion

on November 16, 2015.  The motion is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere

existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477 U.S. at 255.

### III.   DISCUSSION

#### A.  Choice of Law

Plaintiff's breach of contract and breach of warranty claims present a threshold choice of law question.[4]  SW argues that these claims are covered by the Supply Agreement's choice of law provision, which states that the agreement is to be governed under Ohio law.  Def.'s Mot. 19–21, Ex. Y.  Plaintiff, however, argues that

---

[4]     Plaintiff's negligent misrepresentation claim also presents a slightly different choice of law question, which the court will address in a separate section.

the individual purchase orders are the operative agreements governing the dispute, and that these purchase orders are governed under South Carolina law—either because they incorporated plaintiff's standard terms and conditions or under the doctrine of lex loci contractus.  Pl.'s Resp. 5–6.

The core of plaintiff's breach of contract and breach of warranty claims is that:  (i) SW agreed/warranted that it would provide a zinc-rich primer—the CZO Primer—which would meet certain performance standards at certain temperatures; (ii) the CZO Primer did not meet such standards; and (iii) as a result, plaintiff suffered damages.  Id. at 8.  For the purposes of this motion, the court must determine whether there is any state of facts under which the Supply Agreement would not cover plaintiff's claims regarding the CZO Primer.

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599–600 (4th Cir. 2004).  "Choice of law clauses are generally honored in South Carolina." Team IA, Inc. v. Lucas, 717 S.E.2d 103, 108 (S.C. Ct. App. 2011).  Therefore, the court must respect the Supply Agreement's choice of law provision.  Pursuant to said provision, the court must determine scope of the Supply Agreement under Ohio law.

Under Ohio law, a contract is governed by the intent of the parties.  Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth., 678 N.E.2d 519, 526 (Ohio 1997) ("The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties.").  "If contractual terms are unambiguous, a court may not fashion a new contract or

6

interpret contractual terms in a manner not expressed by the clear intent of the parties." Money Station, Inc. v. Elec. Payment Serv., Inc., 735 N.E.2d 966, 970 (Ohio Ct. App. 1999). If contractual terms are ambiguous, however, "the court may look to extrinsic, or parol, evidence to determine the parties' intent." Id. Contractual terms are ambiguous if their meaning cannot be determined from reading the entire contract, or if the terms are reasonably susceptible to more than one interpretation." Id.

The Supply Agreement provides that: (i) SW will be the "preferred supplier of paint, coatings, and related products to [plaintiff]," (ii) plaintiff will pay the price that is in effect at the SW store at the time of purchase, and (iii) plaintiff will receive a rebate from SW based on the amount of products purchased "pursuant to [the Supply Agreement]." Def's. Mot. Ex. Y. Under the Supply Agreement, plaintiff warranted that it could obtain similar products of like grade and quality from another supplier on similar terms, and acknowledged that SW offered the terms set forth in the Supply Agreement to meet this competitive offer. Id. The Supply Agreement also contains an integration clause, which provides that:

> [The Supply Agreement] constitutes the entire agreement between the parties . . . with reference to the subject matter hereof . . . Any term, condition, or language contained in any purchase order or other writing submitted by [plaintiff] to SW shall not be considered an amendment to [the Supply Agreement] and shall have no effect thereon.

Id.

Plaintiff asserts that the Supply Agreement only establishes the parties' agreement with respect to the rebate arrangement, not the actual purchase of SW

7

products, and therefore, the Supply Agreement does not govern the claims in this case. The court finds that this is not a reasonable interpretation of the agreement.

The Supply Agreement appears in all respects to be a requirements contract, pursuant to which plaintiff agreed to purchase, and SW agreed to supply, "paint, coatings[,] and related products." See Ohio Rev. Code Ann. § 1302.19(A) ("A term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith."). Though the Supply Agreement does not use the word "requirements," SW's designation as "preferred supplier" appears to indicate that SW would be plaintiff's only supplier, and thus, the Agreement would implicitly contain a quantity term equal to plaintiff's good faith "requirements" for paint and coating products.[5] Id.

This interpretation is reinforced by plaintiff's representation that SW offered the rebate arrangement to meet the possibility of a competitive offer. Def.'s Mot. Ex. Y. Indeed, if the Supply Agreement allowed plaintiff to purchase from other suppliers, it is not clear what the quantity term of the purchase would be, or how plaintiff would be obligated under the agreement at all. The Supply Agreement would fail for indefiniteness or lack of consideration if it did not grant SW this preferential status. See H & C Ag Servs., L.L.C. v. Ohio Fresh Eggs, L.L.C., 2015 WL 5319931, at *7 (Ohio Ct. App. 2015) (finding that agreement was unenforceable where the agreement had no quantity term and did not qualify as requirements contract, because it lacked language precluding purchaser from buying from another supplier); see also Ohio Rev. Code Ann. § 1302.19 cmt. 2 ("[A] contract for output or

---

[5]        "Preferred" might also mean that plaintiff was obligated to seek its requirements from SW first, before purchasing covered products from other suppliers. This does not change the analysis.

requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure."). A reasonable interpretation of the Supply Agreement cannot ignore plaintiff's obligation to purchase its paint and coating requirements from SW, and consequently, the Supply Agreement must be regarded as a purchase agreement, rather than a limited agreement to provide certain rebates. Under this interpretation: (i) the "subject matter" of the Supply Agreement encompasses plaintiff's breach of contract and breach of warranty claims relating to the purchase of covered products; and (ii) the Supply Agreement's integration clause precludes the purchase orders from altering the parties' obligations with respect to such purchases.

Therefore, the court finds that Ohio law governs the plaintiff's breach of contract, breach of contract accompanied by fraudulent act,[6] and breach of warranty claims.

### B.    Breach of Contract

Plaintiff asserts that SW breached its contracts—i.e. the purchase orders—by providing defective coatings.[7] Compl. ¶¶ 27–28. Plaintiff argues that SW was well

---

[6]    Notably, "[b]reach of contract accompanied by a fraudulent act is an action ex contractu; concomitantly, [South Carolina] analyze[s] this action under the choice of law rules for contracts." Lister v. NationsBank of Del., N.A., 494 S.E.2d 449, 455 (S.C. Ct. App. 1997).

[7]    Though plaintiff's amended complaint contains an allegation that SW breached its contracts by "failing to provide adequate and timely technical support to assist in resolving the [] paint defects" that resulted from the defective coatings, Am. Compl. ¶ 28, plaintiff made clear at the hearing that it is

aware that CMCI needed the CZO Primer to maintain certain performance characteristics at certain temperatures, and that SW represented that these specifications would be met through its product information sheet.  Pl.'s Resp. 8.

As discussed above, it is clear that plaintiff regards the purchase orders as enforceable contracts, separate from the Supply Agreement.  See id.  This theory ignores the language in the Supply Agreement which states that "any term, condition[,] or language contained in any purchase order or other writing submitted by [plaintiff] to SW shall not be considered an amendment to this Agreement and shall have no effect thereon."  Def.'s Mot. Ex. Y.  For the reasons discussed above in connection with the choice of law issue, the court finds that the purchase orders deal with the same subject matter as the Supply Agreement—namely, the purchase and sale of "paint, coatings, and related products."  See Def.'s Mot. Ex. Y.  Thus, enforcing the purchase orders would run afoul of the integration clause declaring the Supply Agreement to be the final expression of the parties' agreement on the subject matter and prohibiting any modification by the plaintiff's purchase orders.  Id.

Such provisions are valid under Ohio law, which allows parties to restrict the manner in which a contract may be modified.  See Citizens Fed. Bank, F.S.B. v. Brickler, 683 N.E.2d 358, 362 (Ohio Ct. App. 1996) ("[S]ubsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary." (quoting Software Clearing House, Inc. v. Intrak, Inc., 583 N.E.2d 1056, 1061 (Ohio Ct. App. 1990))) (emphasis added).  As such, the purchase orders cannot be considered independent contracts.  The

---

not pursuing this theory.  Hr'g Tr. 27:21–22 ("We are not claiming a contract breach as to providing support.")

10

Supply Agreement itself does not contain any promises regarding the products'

performance or other characteristics.  <u>See</u> Def.'s Mot. Ex. Y.

Therefore, the court finds that the parties' agreement did not include promises

regarding the CZO Primer's performance at certain temperatures, and grants SW's

motion for summary judgment on plaintiff's breach of contract claim.

### C.  Breach of Contract Accompanied by Fraudulent Act

Plaintiff's cause of action for breach of contract accompanied by a fraudulent

act alleges that SW's breaches of contract—the same alleged breaches discussed

above—were committed with fraudulent intent, as evidenced by SW's

"accompanying misrepresentations" regarding "the nature and uniqueness of the

[CZO Primer],[8] the cause of the delamination problems, and the nature and extent of

[SW's] efforts to investigate and remedy such problems."  Am. Compl. ¶ 31.

Plaintiff's argument on this issue is largely dependent its underlying assumption that

South Carolina law governs.  Pl.'s Resp. 9–13 (citing exclusively South Carolina

law).  However, as discussed above, the Supply Agreement requires the court to

evaluate this claim under Ohio law.  <u>See</u> Def.'s Mot. Ex. Y.

Defendant argues that Ohio law does not recognize a cause of action for

breach of contract accompanied by fraudulent act.  Def.'s Mot. 24–25.  At the

hearing, plaintiff argued that while Ohio does not recognize any cause of action by

that specific name, it does allow a plaintiff to seek punitive damages on a breach of

contract claim, which is the substantive equivalent of a claim for breach of contract

---

[8]        Though the amended complaint actually refers to the Fast Clad Zinc primer, the allegations
clearly relate to the CZO Primer.  SW argues that plaintiff's reliance arguments relating to the CZO
Primer constitute an improper attempt to amend the complaint.  Def.'s Reply 5.  The court declines to
rest its holding on this technical argument and will ignore plaintiff's "scrivener's error." Hr'g Tr. 5–12.

accompanied by fraudulent act.  Hr'g Tr. 23:16–24:9.  Plaintiff appears to be correct in this assertion; Ohio courts have recognized that punitive damages are available in a breach of contract action "where the breach of contract is accompanied by a connected, but independent tort involving fraud, malice or oppression."  <u>Stockdale v. Baba</u>, 795 N.E.2d 727, 747 (Ohio Ct. App. 2003);  <u>Spalding v. Coulson</u>, 104 Ohio App. 3d 62, 78, 661 N.E.2d 197, 207 (Ohio Ct. App. 1995).

However, this victory only leads to another dead end, as it is clear—and unsurprising—that such punitive damages require an underlying breach of contract.  <u>See</u> <u>Stockdale</u>, 795 N.E.2d at 747 ("[T]he party seeking punitive damages must present not only evidence of a breach of contract, but also evidence of conduct constituting a connected, but independent tort, together with evidence of fraud, malice or oppression.").  For the reasons discussed above, the court finds that there is no evidence of a breach of contract in this case, and consequently, no evidence of a breach of contract "accompanied by a connected, but independent tort involving fraud, malice or oppression."  <u>See</u> <u>id.</u>

Therefore, the court grants SW's motion for summary judgment on plaintiff's breach of contract accompanied by fraudulent act claim.

**D.      Breach of Express Warranty**

Plaintiff claims that SW breached its express warranties by failing to comply with the following provision in plaintiff's standard terms and conditions:

> Seller warrants that all of the Goods, material and work covered under this Purchase Order will conform to the specifications, drawings, samples, data or other description furnished to or by, or adopted by [plaintiff] and that the Goods will be of good material and workmanship, free from defects, merchantable, and fit and sufficient for the purpose(s) intended.

Am. Compl. ¶ 37.  SW argues that it never agreed to, or had any opportunity to

review, these terms and conditions.  Def.'s Mot. 21–23.

> Under Ohio law:
>
> (1) Any affirmation of fact or promise made by the seller to the buyer
> which relates to the goods and becomes part of the basis of the bargain
> creates an express warranty that the goods shall conform to the
> affirmation or promise.
>
> (2) Any description of the goods which is made part of the basis of the
> bargain creates an express warranty that the goods shall conform to the
> description.

Ohio Rev. Code Ann. § 1302.26.  Thus, it is clear that an express warranty requires

the seller to make some "positive representation of fact which induces a prospective

purchaser to buy."  Rogers v. Toni Home Permanent Co., 147 N.E.2d 612, 616 (Ohio

1958).

Here, there is no evidence that SW made any such representation.  SW has

pointed to interrogatory responses, documentary evidence, and deposition testimony

which all indicate that SW never received, much less signed, any document

containing the standard terms and conditions.  Def.'s Mot. Ex AA (affidavit of SW's

attorney indicating that purchase orders produced in response to interrogatories did

not contain plaintiff's standard terms and conditions); Baker Dep. II 32:11–22

(testifying that plaintiff did not know whether purchase order form was accompanied

by plaintiff's standard terms and conditions).  Plaintiff relies on a supporting affidavit

stating that it was plaintiff's standard procedure to make all suppliers aware of the

standard terms and conditions.  Pl.'s Resp. Ex. A ¶ 7.  This is simply evidence of a

habit or general practice.  Such evidence is "never to be lightly established, and

evidence of examples, for purpose of establishing such habit, is to be carefully

scrutinized before admission." <u>Wilson v. Volkswagen of Am., Inc.</u>, 561 F.2d 494, 511 (4th Cir. 1977). "It is only when the examples offered to establish such pattern of conduct or habit are numerous enough to base an inference of systematic conduct and to establish one's regular response to a repeated specific situation . . . that they are admissible to establish pattern or habit." <u>Id.</u> (internal quotations omitted). Plaintiff has not presented any evidence of other times this "standard procedure" was implemented. Therefore, plaintiff has failed to establish a genuine issue of fact as to whether SW even read the standard terms and conditions, much less assented to the statements contained therein.

Plaintiff also contends that the purchase orders incorporated the standard terms and conditions by stating that: "The [plaintiff's] standard terms and conditions for US purchase orders are hereby modified to include the following Federal Acquisition Regulation [] clauses." Pl.'s Resp. 5–6. As an initial matter, this language does not incorporate anything; it simply alters the terms of an ancillary document—the standard terms and conditions, which all other evidence shows was never provided to SW.

More importantly, even if such language could be construed as evidence that plaintiff sent SW the standard terms and conditions, any purported warranty created thereby would still run afoul of the Supply Agreement's prohibitions on modification. Though it is true that "words of description or affirmation[s]" made after the execution of a contract can create an express warranty, this only occurs because such representations operate as modifications to the original contract. Ohio Rev. Code Ann. § 1302.26 cmt. 7. The comments to § 1302.26 state that:

The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order.

Id.

The Supply Agreement provides, in no uncertain terms, that: "Any term, condition or language contained in any purchase order or other writing submitted by Customer to SW shall not be considered an amendment to this Agreement and shall have no effect thereon." Def.'s Mot. Ex. Y. In the face of such language, the purchase orders and standard terms and conditions could not be "fairly [] regarded as part of the contract."[9] See Ohio Rev. Code Ann. § 1302.26 cmt. 7.

Therefore, the court grants SW's motion for summary judgment on plaintiff's breach of express warranty claim.[10]

### E.      Negligent Misrepresentation

Plaintiff's claim for negligent misrepresentation asserts that SW owed a duty of care as manufacturer of the CZO Primer to provide truthful information and that SW breached this duty by falsely representing the product's performance capabilities

---

[9]      The court notes that any purchase orders or standard terms and conditions exchanged prior to the execution of the Supply Agreement would be irrelevant by the very terms of the express warranty plaintiff seeks to enforce, which only extends to "the Goods, material and work covered under this Purchase Order." See Am. Compl. ¶ 37 (emphasis added).

[10]      To the extent plaintiff bases its breach of express warranty claim on representations made in the product information sheet, this argument is not supported by the contents of the amended complaint. See Am. Compl. ¶¶ 34–40 (stating that promises in standard terms and conditions form the basis of the bargain between plaintiff and SW). Therefore, plaintiff may not rely on this theory to support its express warranty claims. See Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); Dove Air, Inc. v. Fla. Aircraft Sales, LLC, No. 1:10CV47, 2011 WL 3475972, at *8 (W.D.N.C. Aug. 9, 2011) judgment entered, No. 1:10CV47, 2011 WL 4002218 (W.D.N.C. Sept. 8, 2011) ("[Plaintiff] cannot constructively amend its Complaint by asserting an argument in a responsive brief.").

in the product information sheet without ever having tested the product's

performance.  Am. Compl. ¶¶ 42–44; <u>see also</u> Pl.'s Resp. 9–10, 14–15.  SW argues

that this claim for negligent misrepresentation is barred by the economic loss rule,

under both Ohio and South Carolina law.  Def.'s Mot. 28–34.

### 1.    Choice of Law

At the outset, it is necessary to return to the choice of law issue, as the

analysis is slightly different with respect to plaintiff's negligent misrepresentation

claim.  As discussed above, "[a] federal court exercising diversity jurisdiction is

obliged to apply the substantive law of the state in which it sits, including the state's

choice-of-law rules."  <u>Volvo Const. Equip. N. Am., Inc.</u>, 386 F.3d at 599–600.  South

Carolina generally respects choice of law provisions, <u>Team IA, Inc.</u>, 717 S.E.2d at

108, and appears to recognize that a contract's choice of law provision can extend to

tort claims.  <u>See</u> <u>Palmetto Health Credit Union v. Open Sols. Inc.</u>, No. 3:08-cv-3848,

2010 WL 2710551, at *2 (D.S.C. July 7, 2010) <u>clarified on denial of reconsideration,</u>

No. 3:08-cv-3848, 2010 WL 3521609 (D.S.C. Sept. 7, 2010) (finding plaintiff's

unfair trade practices claim was so related to the agreement as to be governed by

choice-of-law provision which applied to "'disputes arising [under]' the Agreement")

(alternations in original);[11] <u>see also</u> <u>Hitachi Credit Am. Corp. v. Signet Bank</u>, 166

F.3d 614, 628 (4th Cir. 1999) (applying Virginia's choice of law rules, which

similarly "look favorably upon choice of law clauses," and analyzing whether choice

of law clause was "sufficiently broad to encompass contract-related tort claims" to

---

[11]    Notably, even in finding that certain of plaintiff's tort claims fell outside of the agreement's
choice of law provision, the <u>Palmetto Health Credit Union</u> court appeared to base its conclusion on the
scope of the provision, not the nature of the claims.  <u>See</u> <u>Palmetto Health Credit Union</u>, 2010 WL
2710551, at *2.

assess "parties [intent] to choose the applicable law"); but see In re Hovis, 396 B.R. 895, 909 (D.S.C. 2007) aff'd in part sub nom. In re Marine Energy Sys. Corp., 299 F. App'x 222 (4th Cir. 2008) (suggesting that tort claims are governed by choice of law provision only where such claims present "issue[s] of contractual construction, interpretation, or enforceability").  Therefore, the court must determine whether there is any reasonable interpretation of the Supply Agreement which would extend the choice of law provision to plaintiff's negligent misrepresentation claim.

Courts have been willing to apply choice of law provisions to non-contract claims even when the provisions do not explicitly extend to such claims.  The choice of law provision at issue in Palmetto Health stated that:  "This [a]greement, and any disputes arising hereunder, shall be governed, interpreted, construed and enforced in all respects in accordance with the laws of the State of Connecticut except for its conflicts of laws rules."  2010 WL 2710551, at *2.  The court found that this provision applied to certain statutory claims that were "entirely dependent on or so intricately linked with the Agreement as to constitute a 'dispute arising [under]' the Agreement."  Id.  Similarly in Hitachi Credit, the court found that plaintiff's contract-related tort claims were covered by a choice of law provision requiring the application of "Virginia law in the interpretation of '[the] [a]greement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance."  Hitachi Credit Am. Corp, 166 F.3d 614, 624, 628.

Here, the choice of law provision is worded more narrowly than the provisions at issue in Palmetto Health and Hitachi Credit cases, merely stating that the "[Supply Agreement] is governed by the laws of the State of Ohio."  Def.'s

Mot. Ex. Y.  A separate provision states that the Supply Agreement represents the "entire agreement between the parties [] with reference to the subject matter hereof." Id.  One might regard the representations contained in the CZO Primer product information sheet as part of this "subject matter," inasmuch as they were part of SW's participation in an ongoing sales relationship established by the agreement.  On this view, the two provisions might be read together to argue that, because these representations are part of the subject matter of the agreement and the agreement is governed by Ohio law, the agreement's choice of law provision extends to a claim that such representations were negligent.  On the other hand, it appears at least as reasonable to regard the negligent misrepresentation claim as ancillary to, but not part of, the Supply Agreement.  The Supply Agreement did not explicitly obligate SW to provide the product information sheets or any other representations regarding the products.  Id.  Thus, it could reasonably be said that the claim falls outside the scope of the agreement's choice of law provision and is therefore governed under South Carolina law.[12]

Ultimately, the choice of law question turns on an issue of contractual interpretation.  Because the court finds that either interpretation is reasonable, this issue cannot be resolved at the summary judgment stage.  See World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992) ("Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible of two reasonable interpretations.'" (quoting Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir.

---

[12]    Under South Carolina choice of law rules, tort claims are governed by the substantive law of the state in which the injury occurred—in this case, South Carolina.  Butler v. Ford Motor Co., 724 F. Supp. 2d 575, 581 (D.S.C. 2010).

1965))).  As such, plaintiff's negligent misrepresentation claim will survive summary judgment if it is viable under either Ohio or South Carolina law.

### 2.    Ohio Law

SW argues that, under Ohio law, negligent misrepresentation claims are barred by the economic loss rule except in limited circumstances involving service professionals, such as accountants or financial advisors.  Def.'s Mot. 29–31.  Thus, SW argues, plaintiff's claim must fail because it arises between a commercial manufacturer and a purchaser of goods.  Id.

In Ohio, "[t]he economic loss rule generally prevents recovery of damages for purely economic loss in connection with a tort claim."  Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products Inc., 2007 WL 894833, at *5 (S.D. Ohio Mar. 22, 2007) (citing Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc., 835 N.E.2d 701, 704 (Ohio 2005)).  The economic loss rule is intended to confine the use of tort law to the enforcement of general duties imposed by law, recognizing that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement."  Id. (quoting Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n, 560 N.E.2d 206, 211 (Ohio 1990)).  Thus, a claim may escape the economic loss rule if it is based on a "duty imposed by law to protect the broad interests of social policy."  Floor Craft, 560 N.E.2d at 211.

The Supreme Court of Ohio recognized such a duty in Haddon View Inv. Co. v. Coopers & Lybrand, 436 N.E.2d 212, 214 (Ohio 1982), finding that a defendant could be held liable for professional negligence by third parties who foreseeably relied on the professional's representations, despite the absence of privity.  In

19

recognizing this duty, the court adopted the Restatement (Second) of Torts § 552's

formulation of the tort of negligent misrepresentation.  Id. at 214 n.1.  That section

provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977).  Ohio courts have recognized that claims

arising from this duty are not barred by the economic loss rule.  See Corporex, 835

N.E.2d at 705.

Some courts have interpreted Haddon View restrictively, holding that

negligent misrepresentation claims only apply to cases involving a special

relationship or professional malpractice, and are otherwise barred by the economic

loss rule.[13]  See, e.g., Middlefield Banking Co. v. Deeb, 2012 WL 2874893, at *6

(Ohio Ct. App. 2012) ("[A] claim of negligent misrepresentation has been

characterized as a mere 'business tort related to professional malpractice.'" (quoting

Thornton v. State Farm Mut. Auto Ins. Co., 2006 WL 3359448, at *16 (N.D. Ohio

---

[13]    Some of the cases cited by SW in support of this proposition simply recognize that a fiduciary relationship is required to escape the economic loss rule where the parties are not in privity.  See Fed. Ins. Co. v. Fredericks, 29 N.E.3d 313, 317 (Ohio Ct. App. 2015) ("[I]n the absence of privity or a substitute for privity, the economic loss doctrine prevents recovery in tort of damages for purely economic loss where the defendant breached a duty that even partially arose by contract.");  Ineos USA L.L.C. v. Furmanite Am., Inc., 2014 WL 5803042. *5 (Ohio Ct. App. 2014) appeal not allowed sub nom. Ineos USA, L.L.C. v. Furmanite Am., Inc., 31 N.E.3d 655 (Ohio 2015) ("Here, there is no question that the parties are in contract privity.  As a result, the economic loss rule does not generally apply.");  Ballreich Bros. v. Criblez, 2010 WL 2735733, at *4 (Ohio Ct. App. 2010) (stating "[the economic loss rule] appears to apply primarily in the absence of contractual privity when a plaintiff seeks to recover in tort for a purely economic loss," and recognizing professional negligence claims as one of multiple exceptions to the economic loss rule).  As it is clear that the parties in this action are in contractual privity, the conclusion to be drawn from such cases, if any, is that the economic loss rule does not apply to plaintiff's negligent misrepresentation claim.

Nov. 17, 2006))).  However, this conclusion is not universally accepted.  See Nat'l

Mulch & Seed, Inc. v. Rexius Forest By-Products Inc., 2007 WL 894833, at *11

(S.D. Ohio Mar. 22, 2007) (rejecting view that negligent misrepresentations cannot be

brought against "a party to an 'ordinary business transaction'"); Hodell-Natco Indus.,

Inc. v. SAP Am., Inc., 13 F. Supp. 3d 786, 813 (N.D. Ohio 2014) (accepting

recommendation that the court reject "special relationship" requirement and follow

the view outlined in Nat'l Mulch).

In National Mulch, the plaintiff, a mulching and landscaping company,

contacted the defendant truck manufacturer about the possibility of supplying trucks

for use in the plaintiffs business.  Nat'l Mulch & Seed, Inc., 2007 WL 894833, at *1.

The defendant made various representations concerning the trucks' specific

capabilities that would enable the plaintiff to utilize them in its operations.  Id.  The

plaintiff later found these representations to be false and brought a negligent

misrepresentation claim based upon the aforementioned representations.  Id.  The

Southern District of Ohio found—after a comprehensive review of Ohio law on the

subject—that the economic loss rule did not apply to a negligent misrepresentation

claim in a commercial transaction between the seller of a commercial product and a

purchaser of that product.  Id. at *5–9.  The court specifically rejected the argument

that the tort requires a "special relationship," which is not present in "ordinary

business transaction[s]."  Id. at *11.  Instead, the court explained that the "special

relationship" requirement was simply "a characterization of the requirements that for

liability to exist:  (1) the defendant must provide false information for the guidance of

the plaintiff in its business transactions and (2) the plaintiff be the person or one of a

limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it." Id.; see also Hodell-Natco Indus., Inc. v. SAP Am., Inc., 13 F. Supp. 3d 786, 812 (N.D. Ohio 2014) ("The Ohio Supreme Court has spoken on the sort of relationship required, explaining that liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." (quoting Gutter v. Dow Jones, Inc., 490 N.E.2d 898, 900 (Ohio 1986))).  The court found that the majority of Ohio courts addressing the question suggested that these elements could be satisfied where the false information at issue was supplied by the opposite party in the course of a business transaction.  Id. (citing Lippy v. Soc. Natl. Bank, 651 N.E.2d 1364, 1368 (Ohio Ct. App. 1995); McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc., 622 N.E.2d 1093, 1107 (Ohio Ct. App. 1993)).  The National Mulch court also found no reason to think that the subject matter of a transaction should have any bearing on whether this element was satisfied. Id.

      This court finds the holding and rationale of National Mulch persuasive.  As an initial matter, this result fits well within the language of Restatement (Second) of Torts § 552.  Contractual counterparties each have a "pecuniary interest" in their transaction and generally supply one another with information intended to guide the other in the transaction.  See Restatement (Second) of Torts § 552 (1977).  Other courts applying Ohio law have also recognized negligent misrepresentation claims between counterparties to a purchase and sale transaction.  See Hodell-Natco Indus.,

Inc., 13 F. Supp. 3d at 813 (accepting recommendation that the court recognize negligent misrepresentation claim against software manufacturer and follow the view outlined in National Mulch); Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC, 947 F. Supp. 2d 841, 856 (S.D. Ohio 2013) (recognizing negligent misrepresentation claim by mulch purchaser against chemical company for misrepresentations regarding the nature of the chemical treatment purchased over several years); Leal v. Holtvogt, 702 N.E.2d 1246, 1255 (Ohio Ct. App. 1998) (affirming trial court's finding that seller of stallion negligently misrepresented that stallion was fit to be shown); see also Geier Bros. Farms v. Furst-McNess Co., 186 F. Supp. 2d 798, 807 (N.D. Ohio 2002) (recognizing claim that seller of feed "falsely and negligently represented that the [feed] was unspoiled and untainted by salmonella and metal shavings," but granting summary judgment on plaintiff's failure to present evidence that defendant failed to exercise reasonable care in obtaining information it provided to plaintiff).

Therefore, the court finds that under Ohio law, a claim for negligent misrepresentation is not limited to professionals or parties in a "special relationship," nor is it barred by the economic loss rule. Instead, such a claim is viable, so long as plaintiff can prove that: (1) the defendant provided false information for the guidance of the plaintiff in its business transactions; and (2) the plaintiff is one of a limited group of persons for whose benefit and guidance the defendant intended to supply the information or knew that the recipient intended to supply it. See Nat'l Mulch, 2007 WL 894833, at *11.

Here, there is at least some evidence that the product information sheet was used to guide plaintiff's business transactions, since it contains information on the

product's performance and was provided to plaintiff in 2011,[14] before the

delamination problems surfaced.[15]  Email Support Requests CMCI 0221.  A

reasonable juror might find that SW intended, at least in part, that this information

would facilitate plaintiff's use of, and thereby future purchase of, the CZO Primer.

Moreover, it is clear that SW supplied this information in the course of its business

and in connection with a transaction in which it had a pecuniary interest.  Finally, it is

also clear that plaintiff was the specific recipient SW intended to guide or benefit with

this information, as it related to a product made exclusively for plaintiff and was not

even generally available.  Email Support Requests CMCI 0218–19.

Therefore, there is a question of fact as to whether SW negligently

misrepresented the performance capability of the CZO Primer in the product

information sheet.[16]

---

[14]       SW also argues that the statute of limitations has run on the negligent misrepresentation
claim.  Ohio applies a four year statute of limitations to negligence misrepresentation claims.  Lasmer
Indus., Inc. v. AM Gen., LLC, 741 F. Supp. 2d 829, 836 (S.D. Ohio 2010).  Unlike South Carolina,
Ohio does not utilize the discovery rule when measuring the statute of limitations for a negligent
misrepresentation claim.  Orshoski v. Krieger, 2001 WL 1388037, at *6 (Ohio Ct. App. Nov. 9, 2001).
However, because the product information sheet was distributed to plaintiff at least once in 2011, less
than four years before this action was initiated on February 21, 2014, the court finds that there is a
genuine issue of fact as to whether the action was timely filed.
[15]       This is not to say the subsequent distributions of the product information sheet could not have
been for the purpose of guiding plaintiff's business transactions, simply that this purpose appears most
applicable to the 2011 distribution.
[16]       Though the court finds it doubtful whether plaintiff's negligent misrepresentation claim could
be maintained under South Carolina law, it is unnecessary to make such a determination at this time.

## IV.  CONCLUSION

For the foregoing reasons, the court **GRANTS** SW's motion with respect to plaintiff's claims for breach of contract, breach of contract accompanied by a fraudulent act, and breach of express warranty; and **DENIES** SW's motion with respect to plaintiff's claim for negligent misrepresentation.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 25, 2016**
**Charleston, South Carolina**